Base number 14-3922 Omar Alomari v. Ohio Department of Public Safety at all or argument not to Morning, your honors. My name is Lara Knoll and I represent Omar Alomari and his case, his appeal against the Ohio Department of Public Safety. If I may, I'd like to request four minutes for rebuttal. The investigation in this case was a sham. It was rigged. It was set up because they wanted to terminate Omar Alomari. In 2004, Judge Clay, you decided a case, well you were on the panel, for Noble v. Brinker International. You were the dissent. In 11 years since, I have never seen that case cited other than for your dissent. And you're familiar with these facts in this case. But the dissent is heresy. Well, I understand that, but it was cited as late, as recent as last week in EEOC v. Newbreed. But the facts in this case, I point this out because the facts are very similar here and you got it in that case. First of all, what they accused Omar Alomari of, lying on his application, he didn't do. He didn't lie on his application. He didn't intentionally conceal, one, of the entire realm of his employment from the Ohio Department of Public Safety. He didn't do that. And two, even, they had knowledge of this at the time he was even hired. Now, the reason I say this investigation is a sham because there's documents that have been withheld. There's documents that have been withheld from me. There was documents that were withheld from the investigator. And there was so many inconsistencies in Bill Vedra's testimony that I had to chart it out in the reply brief. There's three pages of it. Bill Vedra's comment. He said that Kathy Collins Taylor was the one who initiated the investigation against Omar Alomari. Kathy Collins Taylor said, no, by the time he got to me, it was already initiated. He said Kathy Collins Taylor decided not to initiate an investigation of Olin Martin. Kathy Collins Taylor didn't even know about Olin Martin until afterwards. Olin Martin is the white comparable in this case because we're forced into, first of all, he didn't do it. But then we're forced into the similarly situated analysis. Well, who was similarly situated? Well, we have Olin Martin, the same guy who was actually accused. And I deposed and said, yes, I did not go to that school. I wrote an essay. I paid money. I got a degree. I got it in 2005. But I put on my application as 1996, 1997 as getting my degrees. I said I was there for three to four years because I thought that's how long it would take me to get it had I really gone. And the excuse for that, Bill Vedra says, well, you know what? He really didn't need that degree to do his job. Well, you know what? Omar Alomari really didn't need Columbus State to do his job either. So if we're going to. Let me ask you this. Are the two situations really different and distinguishable by the fact that your client was also alleged to have committed some sexual misconduct in his employment at the community college or whatever that entity was? Does that make the two cases not comparable? No. The question is did he lie on his application? Not why did he lie on his application. Did he lie on his application? The seriousness of the lie might be of some import. That's really what I'm asking. Well, see, that's where the investigation comes back into play because what Department of Public Safety wants you to believe is, oh, my God, he's out there sexually harassing all these young girls. And that's not what happened. That's what the radical paper wanted you to believe too because they were mad that this Arab guy is working in Ohio Homeland Security. If you say that, then you get the audience to just hate the plaintiff and say, well, he got what he deserved. And I'm hoping that this panel looks past that tactic because that's not what happened. He was in the middle of a divorce. I'll address it because I need to. His wife was divorcing him. He started working with a student that was not his student, a non-traditional student who was older. And they had a relationship where they were going to get married and they were in love. They were in love. And it ended badly because she took his class. And I ask that you please read John Scoville's affidavit because in his affidavit, though Mr. Alomari is quite the gentleman, Mr. Scoville says that the woman blackmailed Mr. Alomari for a grade and that's why he had to break it up. And never did they tell him he was under investigation for sexual harassment at Columbus State. And never was he terminated. And when you see the documents that were provided in the record, you're not going to see any termination documents from Columbus State. What you're going to see is a settlement agreement. He didn't file suit. It was a settlement agreement. They went to a mediation. Mr. Scoville was there. And it says Mr. Alomari will resign. He was not on the schedule, I will tell you that, but he was still considered an employee. It said he will resign. And he did. And so, no, it's totally different. And it doesn't matter. And had they actually, that settlement agreement, investigator didn't get that. When I showed it to her in deposition, she's like, no, I didn't see this. So, no. They're making it out to be something and it isn't. And that's why this is a sham. This investigation is a sham. And the fact that the documents went through legal, who Ms. Bodas, the investigator, said it wasn't usual. They don't usually get the documents for me. I usually get them. And then select documents didn't make it. But then documents that could make the case, that made it look like he was lying, those were the ones that were given. So this is why this is important. He didn't do it. That's why the sexual harassment allegations, that's not important. Why did he resign? He resigned because they did not like the fact he had a relationship with a student. But if he was totally innocent, my question still then is, why did he resign? Because they weren't going to put him back on the schedule and he wanted to move on. Within the file from the Columbus State College. Were they going to fire him? No. No, they were not going to. They didn't say they were going to fire him. They took him off the schedule and there was this big battle between the community at the college. There was an eight-page letter, eight-page report that said that there was no wrongdoing. This was not handled properly. And we find in favor of Mr. Alamari remaining a faculty member. And then the vice president overruled that and didn't do it. So the committee charged with the findings said that it was all wrong. In the Scoville affidavit, Mr. Scoville says he was intimately involved in this whole process and he can give personal account of it. And he did. And he tells you exactly what he did. Now, you're not going to see Mr. Scoville's affidavit mentioned anywhere in the district court's decision. I'm a little thick today, but I'm still not quite sure. If everybody said he didn't do it and he's having some kind of hearing about whether he did or not, and it's clear he didn't do it, why did he resign? It wasn't a hearing, Your Honor. It was a mediation. And because they weren't putting him back on the schedule. They wanted him to move on. It was a compromise, which is what we do all the time. It's not because he didn't do it. What do you mean, put him on the schedule? You mean the teaching schedule? Yes, the teaching schedule. That's the same as firing him, right? Not necessarily, no. They did not do the paperwork to fire him. This is, we want you to go. I guess if you can't teach anymore and they don't pay you, that's pretty close to being let go, isn't it? It's effectively terminated, but he was not terminated. You know, we're getting, the problem is we're getting into something that is ancillary to the issue, and there was a specific reason. I know that it's ancillary. That's why I'm trying to figure out why he resigned. Well, but the problem is. You know, usually it sounds guilty when you do that, is what I'm saying. Well, sometimes you cut your losses, and that's what he did. I mean, because they weren't going to believe him. But you're telling me that nobody thought he did anything wrong, so what loss was he cutting? I'm not saying that nobody. I'm saying that there was a vice president that was upset about it. But I'm saying the committee that the vice president overruled said there was nothing. He overruled the mediator? No, the mediator was years later, was two years later, and the mediator was there to mediate, to find a compromise between the two parties. I mean, it's the same situation as me settling a case for my client instead of going out there and proving my client's right. At some time, you've got to figure out what's best for your life at the time, and that's what happened here. It's a matter of common sense and practicality, and that's it. That doesn't mean that he did it. There was very valid reasons for, number one, why that wasn't on the application we do have. We believe that it's on the handwritten application. There was extenuating circumstances. But in addition to that, he was hired with his resume in 2005. This all happened in 1996, Columbus State. 2005, he's hired as a contractor by Merkel. Mr. Merkel is the director of ODPS at the time. He knows Mr. Alomari. He hires him. Omar Alomari gives him his resume. He has it. The next year, he also talks to Mr. Overley. Mr. Overley is going to be the director of Homeland Security. He gives Mr. Overley his resume, and Mr. Overley testifies in his affidavit, I had the resume in my hand. But missing from the public records file is the resume that has Columbus State on it. And in addition, Mr. Alomari also listed Mr. Scoville on his personal references, on his professional references. But missing from the file, public records file, is the list of professional references. I see that I'm out of time, Your Honor. Did I answer your question completely, sir? You answered it. I don't know if it was complete or not, but you answered it. Well, perhaps we could follow up in the next rebuttal. I think you should make your other arguments when you get it. May it please the Court, my name is Rory Callahan. I'm counsel for the appellees and defendants in this case. I'm with the Ohio Attorney General's Office. I represent the Ohio Department of Public Safety, the individual defendants, former Director of Public Safety, Tom Stickrath, former Executive Director of Ohio's Homeland Security, Bill Vitra. And I want to just start by saying I feel that there have been several misstatements about the record made during Mr. Alomari's counsel's presentation. First, this is a termination case. He was terminated after an administrative investigation in June of 2010. That investigation was conducted by Kathleen Botos, who was deposed. She prepared a seven-page report. She'd never met Omar Alomari before. She hadn't worked with him. She called him in for an interview. It was tape recorded. There's a transcript of that recording. So there's no dispute about what he said during the interview. During the interview, she showed him a copy of a two-page civil service application that he signed. She said, is this your signature? He said, yes. She said, the form says, show all previous employers. He said, I see that. And Columbus State was not on there. There were only two previous employers. What he said to her during the interview was, I didn't list Columbus State because nothing I did at Columbus State was relevant to what I was doing at Public Safety. Now, what was his job at Public Safety? He was a one-person office for the state of Ohio, as he put it. He started a multicultural relations office, a community engagement office, within Ohio Homeland Security. It was really a one-of-a-kind office in the state of Ohio compared to what other states around the country were doing, where cultural outreach was treated as part of almost a counterterrorism tactic to educate communities that might be marginalized about what Public Safety was doing and fight against radicalization. So it was a novel project, but it was really kind of uncharted territory. And so he was doing all these things. What had he done at Columbus State? He was translating Arabic articles. He said he only taught Western civilization, but he taught courses on Islam on the Middle East. That wasn't true. He said two other things that weren't true. He said he resigned. He did not resign from Columbus State. In December 1996, after an investigation by Columbus State based on an allegation of sexual harassment, he was fired. There isn't a piece of paper saying you're fired. That's correct. But he was fired. After December 1996, he engaged in a two-year legal battle where he never returned to Columbus State. He was never working there. And at a mediation, he did receive a $50,000 settlement. There was a lawsuit filed in the Ohio Court of Claims. He got $50,000. He had three different attorneys during those two years, raising all kinds of different issues. So to say he was resigned is kind of a technical legal argument. But no, he didn't resign. But he told the administrative investigator that he resigned. In his lawsuits that you may reference to in his pleadings and briefing in those lawsuits, does he state in those papers that he was fired? Yes, he does, Your Honor. That's an excellent question. Five days after he got a $50,000 check from Columbus State on January 14, 1999, he filed a lawsuit against the woman that he'd had the relationship with, alleging that she had caused him to be fired. She counterclaimed against him for sexual battery because she had been a student in one of his classes. His lawsuit against the student that he had the sexual relationship with was dismissed on summary judgment motion after a number of depositions and after a year and a half of litigation between him and the student that he'd had the relationship with in Columbus State. And that was the third thing that he lied about during this administrative interview. He said there was no allegation of sexual harassment against him in Columbus State. Again, there's no question of fact about what he said to the interviewer. It was recorded and it's been transcribed and it's in the record. So he said, I didn't disclose Columbus State because it didn't have anything to do with what I was doing in public safety. I didn't disclose it. Didn't he also say when he was filling that out, one reason he didn't put it down was he was in a rush and somebody told him only put down the more important things and he thought he was putting down stuff that was most relevant to the job he was applying for. He said that three years later in discovery, Your Honor. He didn't say it to the investigator during the interview. That's not in the interview at all? That's not in the interview. Okay. He said that during discovery later. The other issue that came up was he said during discovery, again, not what he said to the interviewer was that he thought he had a handwritten civil service application and maybe that had Columbus State on it. And then this question of a resume that he sent to, I guess now it's former Director Morkel, I think in the record it was former Executive Director of Homeland Security, John Overley, now that he'd sent a copy of his resume and he thinks that resume that he emailed in 2005 had Columbus State on it. I don't have a copy of that resume. I will say that there are lots of copies of Omar Alomari's resume in the record because he did while he was at public safety. He was going all over the country making speeches and presentations on behalf of Homeland Security and he would email different copies of his CV and resume to Las Vegas. He spoke in Brussels. He testified before Congress and he had lots of different copies of his resumes that he would email around just to show people his background. So there's a lot of issues with the record. The record, really what's material here, is very small. It's what the administrative investigator looked at and what was communicated up the chain to the Director of Public Safety when he decided to terminate Omar Alomari. Let me ask you this. I guess your adversary is saying that the plaintiff is not being compared properly as he should be compared to a comparable situation with this other employee by the name of Martin because that fellow fabricated information on his application and he was not fired, nothing was done to him. The fellow who put down two sources of two degrees that he paid for online and didn't do any work for and they're saying that that's comparable to what occurred with the plaintiff. What happened to the plaintiff was discriminatory because that fellow was let off scot-free. What's your response to all that? Just as you asked her during her presentation, the misconduct alleged is totally different. They're not similarly situated for two reasons. One, they had very different jobs. Omar Alomari was traveling around the country. He testified before Congress. He was developing policy. Olin Martin had a law enforcement and military background and was working more individually with specific law enforcement. But the misconduct alleged is totally different here. Omar Alomari was investigated for not disclosing prior employment where he was fired for having a sexual relationship with a student at the college. As it developed, he had a whole story about how we had the relationship when I was helping her on a research project, but then I told her to sign up for not my class, a different class, but I stopped it when she signed up for my class, but then she blackmailed me. It's just kind of a lot of dissembling in that. It's not really any material questions of fact. He had a sexual relationship with a student at Columbus State, and that's why he was fired. Olin Martin was alleged to do something that actually a lot of military members have apparently done in the past. There's testimony about that in the record, is get a life experience degree from an online degree. Now in Omar Alomari's mind, with an academic background, that's just a diploma mill, so it's not a legitimate degree. So he's arguing about the legitimacy of the degree, not that there's something false about it. And that's how the executive director of Homeland Security, Bill Veed, reviewed it. He said, okay, well, that's a diploma mill. The diploma wasn't even necessary for the work that Olin Martin is doing, working with other law enforcement agencies around Ohio and on the northern border of Ohio. The allegation by your opposing counsel would be that that was a fabrication because he didn't do any work for the degree, he just paid for it online and put it down as though he had earned the degree when he had not. Is that comparable misconduct or not? No, it's a difference of opinion. Okay, if we're talking about pretext here, if we're supposed to be talking about pretext, I'd say they're not even similarly situated, because the facts are different. Olin Martin having a degree from a diploma mill is different than Omar Alomari not disclosing Columbus State because he was fired for a sexual harassment investigation and a sexual relationship with a student at Columbus State. Those are just much different allegations of misconduct. And so first, I mean, this is even a prima facie case problem. Let me ask you kind of the same question I ask your counsel. Why did you give him $50,000 if you legitimately fired him? I mean, the university. You know, that's Columbus State's issue. For whatever reason, the case hadn't gone away over two years. He hadn't been reinstated. I think, candidly, Your Honor, what I saw on the record was that Human Resources did an investigation and found that he should be fired. A faculty committee at the college did an investigation and they made a different recommendation that he did have a relationship, but it wasn't while she was technically in his class, and he shouldn't be fired for that. So there was kind of a difference of opinion back in the 1990s at Columbus State between what Human Resources wanted to do with all the different duties that they've got under Title IX or Title VII about allegations of sexual harassment and what a faculty committee at Columbus State. So a difference of opinion back in the 1990s. That doesn't create a question of material fact. But you say it becomes relevant because there was sexual harassment, but evidently two groups in the university disagreed with whether it was sexual harassment or not. Your Honor, the reason I mentioned it is because the investigator asked him, was there any allegation of sexual harassment? He said, no, no, no allegation of sexual harassment. During the interview. I mean, being called into an administrative interview is a serious thing that should be taken seriously. Not just a game of, I'm only going to mention this or mention that and see what you find out. So she interviewed him before she'd seen any documents from Columbus State. And then when she did, it was pretty obvious. Again, for three different reasons. He said it had nothing to do with his work. So he was fired because of what he said in the investigation? Or was he fired for what he said in the application? For both reasons, Your Honor. I mean, this is the state of Ohio. He was provided with civil service order. There were specific reasons right in the order. And I can read it to you. You, Omar Al-Marty, when he was fired, this is the notice he was given. I've read that, but I'm just a little confused. I'm sure a little bit of your co-counsel's or your sister counsel's confusion here a little bit. And he was provided with those reasons in writing. It was not disclosing it. Again, she showed him the civil service application. And the longer narrative that Omar Al-Marty has provided has come through discovery and doesn't really change what he said during the interview. First is the nondisclosure of Columbus State. And then when he lied during the interview, the investigator concluded that he had an incentive to cover it up. And that's why he was dishonest during the interview. So those two parts were both cited to him in the order of removal that he was served with on his last day of work back in June 2010. It was both the nondisclosure and then on top of that, really aggravating circumstances, his lies during the interview. When he said, oh, my work at Columbus State, nothing to do with what I'm doing now. That's why I just left it off. I resigned. Well, actually, no, you engaged in a two-year legal battle where you got $50,000. Oh, and the settlement agreement? There was a written settlement agreement from Columbus State that didn't mention resignation. What does the fact of that whole relationship, the confusion of it, have to do with his current job? Or his job that he was fired? I mean, you made the statement about the fellow that falsified his degree background as having nothing to do with his job. What does this have to do with it? The media made it an issue. There were media inquiries about the Columbus State allegations that he'd had an allegation of sexual harassment against him that he was fired for at Columbus State. And again, there was testimony that, well, it was on these... He brought bad publicity to the department. Is that why he was... Yeah, he was... ...trying to figure out what... Because, yeah, and he lied. He lied about it when he was asked. Well, the other guy lied, you might say, too. And you quickly say, well, that has nothing to do with the work he's doing. And I'm trying to say, well, what does this litigation that he had with this woman have to do with his current employment with the department, you say, because the newspapers got hold of it. And so is that the reason the investigation went forward? It was... Yeah, he was in a high-level position of trust. And there were different websites that were attacking Omar Alomari's work. And I think plaintiff's counsel has always wanted to kind of use whatever was on various websites or critiques of Omar Alomari as a proxy for discrimination in what the employer did. And the employer didn't really view any of those as credible sources for two years prior to this investigation. But a lot of times, just like when there's an allegation of employee misconduct or a criminal allegation that comes in to an investigator, if it comes from an ex-spouse, a disgruntled neighbor, or even for political reasons, I mean, that's one issue, whatever the motive is, but it quickly becomes an investigation into what is the actual misconduct alleged. And when there was an actual investigation here into Columbus State, the people that were working with him at public safety didn't know about his background at Columbus State. And when they discovered it, and then when he lied about it during his interview, I mean, that had been an opportunity to kind of come clean and explain everything. And he didn't do that. He dissembled. He said, oh, I resign. Was there some kind of record that discloses what the mediator ultimately wrote up or did in this regard? Well, there wasn't an award. It was a mediation. There were some handwritten notes saying that Omar Alomari, it will be treated as a resignation in the notes from the mediation. For whatever reason, that didn't end up in the final settlement agreement that he signed where he got the pension dollars. So saying he resigned is not necessarily a lie. Well, even a difference of opinion, it's not a lie for public safety to say, well, we looked at the record, and we think he's not being honest, and he didn't answer forthrightly and truthfully these answers during the interview. That's not pretextual. A pretext is a lie, not a simple mistake, not a difference of opinion. I know you're out of time there, but just one last issue here. Your client was being attacked by these various websites accusing him of being sympathetic to terrorists and radical Islam and that kind of thing. To what extent did that controversy contribute to the decision to let him go? Or if it didn't contribute, to what extent was it weighed or considered in the decision regarding his employment? There's no evidence that it was a factor at all. But it was sort of what precipitated the investigation. No, only a report about Columbus State on one of the websites, not about him being sympathetic to terrorists or anything like that. Other web postings about those weren't the trigger. It was the allegations at Columbus State and sexual harassment that triggered the investigation. I could talk for another ten minutes about that. The fact that that was publicized, didn't that cause the relationship between the plaintiff and the employer to, for lack of a better way to put it, deteriorate or decline prior to or leading up to the termination? Not at all, Your Honor. He still spoke at a conference in Brussels while the investigation was going on. It was really the conclusions of the investigation that triggered the review. He still spoke at the National Association of Chiefs of Police, or was present at the National Association of Chiefs of Police conference during April 2010. Well, when the investigation occurred, did the investigation delve into these blog postings accusing him of being some sort of radical Muslim? Did that get involved in the investigation at all? No. I think the investigator looked at a couple of the Jawa blog posts, but really she focused on developing a record about Columbus State because that was where there were some court documents, and then when they got documents from Columbus State, that was the issue. Her focus wasn't on the Jawa report or any of those blogs. And again, what's in the investigation report is detailed. It was conducted by an investigator who had no prior experience with Omar Imani, and in fact the investigator had never worked with Bill Vedra, the Director of Homeland Security, either. She was separate and apart from that. I mean, she's an investigator for public safety with thousands of employees. She hadn't worked with anyone in Ohio Homeland Security, and that's what really insulates from any of these kind of half cat's paw arguments or any of that because Bill Vedra had no involvement with this investigation at all. The investigator had her own independent review. She interviewed Al Amari. She drew her own conclusions and recommended not only that he'd had an intent to conceal Columbus State but that he lied during his interview. All right. Thank you. Thank you, Your Honor. Thank you. Kathleen Botes was a pawn. They fed her what they wanted to feed her. They fed her what they wanted to feed her, and when she called Trooper Alonzo and said, I need the background check on somebody that's getting fired, and that was in April, or first of May. That means he's getting fired. She hasn't even talked to him yet. And during the investigation, her investigation, he said he resigned pursuant to litigation. They always leave that part out. Pursuant to litigation. It's in the transcript. But let's keep in mind what they did. Vidra, first of all, said in April of 2010, Omar Al Amari meets with Vidra and Heather Reed Frent about media. They've got to figure out how to deal with media. All I can tell you, because I was not allowed to have information about that conversation, is two things. Is that he told them everything, and that he offered to resign if it was going to damage the mission of the office and damage his reputation. They said, no, no, no. This is not going to happen. Okay, so there's no investigation. Earlier that day, there was already an investigation underway, but they didn't tell him that. And then the investigation shows up, and Vidra says, no, no, no. It's just a formality. It's a formality. And so he's going into this investigation, thinking this is a formality. She's asking all these questions like, what, what, what? Well, I did. I resigned pursuant to litigation. And then there is a flat-out, handwritten settlement agreement, and it's attached to Mr. Scoville's affidavit. And it's there, and it's signed by the attorneys. It's signed by Omar Al Amari. It is a settlement agreement. There was no litigation. Because he was going to have to sue in the Court of Claims, because there was no litigation, that he had to file a lawsuit in the Court of Claims in order to make the settlement happen. That is how there's a lawsuit. And so the attorney drafted up a quick lawsuit. His attorney gave us an affidavit and said why the language was what it was. So he's not lying. Just as Mr. Callahan said that, well, the state's not lying because they had a right to believe this, well, Mr. Al Amari's not lying, because there's people that said that what he did, what he's saying is truthful. And, you know, who knows what Mr. Martin would have said had he actually been investigated. That's the only reason we don't know what Mr. Martin would have said and how much information we would have found out during an investigation because they didn't investigate him, because they didn't need it. And earlier this morning, Your Honor, I heard you say, well, was it these guys jumping off buildings or are they ditch diggers? Well, these two guys jumped off buildings. They jumped off big, important buildings. Both their jobs served the mission to protect the citizens of Ohio and to teach others how to do it. They just did it in two different forms. Mr. Mack was Mr. Martin's supervisor. Mr. Mack reported to Mr. Vidra. I hope you didn't hear me say anything. I hope all I was doing was asking questions. Well, you asked the question. That's what I meant, Your Honor. I apologize that that didn't come out clearly. Mr. Mack went to Mr. Vidra and said, if you're going to investigate Omar Alomari, you have to investigate Mr. Martin. And Mr. Mack, throughout his deposition testimony, said, this is discrimination. This is because he would not be quiet about the use of public funds for these counterterrorism trainings that were only pushing hatred of Muslims. That is the reason. We've got the head of Ohio Homeland Security saying this is wrong. We've got, at the same time, there's investigations going on. Mr. Mayer, another higher up, is telling Mr. Mack to stay out of it. Watch your back. Now, they're trying to draw this big Chinese wall between the investigator and Mr. Vidra, but there's three pages and it's charted out piece by piece of information about how Mr. Vidra lied. Why else? Do you not tell the truth? Why wouldn't you just say, I initiated the investigation? Because he had ulterior motives. He had an agenda. It is self-preservation of Mr. Vidra. It's self-preservation of ODPS, and that's why he did it. And had he not been of Arab descent, as Mr. Vidra said later, had he not been of Arab descent, it would have not been an issue. And that is what, it's proven by the fact that Mr. Martin wasn't even investigated. I see my time is up, Your Honor. Thank you, counsel. The case will be submitted. The remaining cases for the morning are on the briefs, so the clerk may adjourn the court.